YORK HAVEN PAPER CO. v. YORK HAVEN WATER & POWER CO.

(Circuit Court, M. D. Pennsylvania. December 18, 1911.)

No. 72.

1. NAVIGABLE WATERS (§ 36*)—LANDS UNDER WATER—RIPARIAN RIGHTS—LAW OF PENNSYLVANIA.

Under the law of Pennsylvania, the absolute estate of a riparian owner on the principal rivers of the commonwealth extends no further than to ordinary high-water mark. but beyond this point to ordinary low-water mark he holds a qualified estate subject to the public rights of navigation, while beyond ordinary low-water mark the title to the bed of the stream is in the commonwealth, and the right to the use of the water follows the ownership of the bed in which it flows.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 180–200; Dec. Dig. § 36.*]

2. NAVIGABLE WATERS (§§ 36, 46*)—RIPARIAN RIGHTS—EXTENT OF RIGHT TO USE WATER.

Under the Pennsylvania milldam act of March 23, 1803 (4 Smith's Laws, p. 20), a riparian owner on the Susquehanna river has the right to erect dams for mills or other works adjoining his lands and to lead off on his own lands so much of the water as may be necessary for his purposes, subject to the navigation rights of the public. Such right is no more than a revocable license which may be revoked by the state whenever the interests of the public may require it, but the license is coupled with a riparian interest, which, unless excepted or reserved, passes with a conveyance of the land and any sensible interference with which by another constitutes an actionable trespass.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. §§ 189, 283–293; Dec. Dig. §§ 36, 46.*]

3. NAVIGABLE WATERS (§ 46*)—DAMAGES (§ 78*)—INJUNCTION (§ 48*)—CONVEYANCE OF RIPARIAN LANDS—EXCEPTION OF WATER RIGHTS—CONSTRUCTION—LIQUIDATED DAMAGES—CONTINUING TRESPASS.

Complainant conveyed riparian lands on the Susquehanna river adjoining those on which it operated a large paper mill by water power to defendant, a power company, with all water rights excepting as therein reserved, but reserving to itself and its successors for all time a sufficient flow of water to enable it to develop 3,000 horse power, said supply to be furnished without cost or charge to it at the head gates to be con-

structed by defendant in accordance with plans to be approved by complainant. There was a further provision that, in the event of a failure or refusal to supply such water, defendant should pay liquidated damages at the rate of $40 per horse power per annum for the deficiency. Defendant constructed its plant, but during seasons of low water willfully failed to furnish to complainant the required quantity of water, diverting the same to its own use, with the result that complainant could not operate its mill to full capacity and sometimes not at all, to its serious damage. Defendant's sole business was the generation of electric power which it sold to public service and other corporations. *Held*: (1) That the clause in the deed was an exception by which complainant retained, as appurtenant to its mill property, the paramount right to water sufficient in quantity to generate 3,000 horse power from the water it was then licensed by the state under the milldam act to appropriate, to be delivered from that flowing into defendant's forebay, and that the willful appropriation of any part of such quantity by defendant was a trespass on complainant's property rights; (2) that the provision for liquidated damages did not cover such misappropriation, but only the failure to furnish the water; (3) that defendant was not a public service corporation nor entitled as such to treat complainant as a customer, with the same rights as other customers; (4) that defendant's acts constituted a continuing trespass which threatened irreparable injury to complainant's business and entitled it to maintain a suit in equity for relief both on that ground and as avoiding a multiplicity of suits.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 290; Dec. Dig. § 46;* Damages, Dec. Dig. § 78;* Injunction, Cent. Dig. § 101; Dec. Dig. § 48.*]

**4. DEEDS (§ 138*)—CONSTRUCTION—"EXCEPTION" OR "RESERVATION."**

The distinction between a "reservation" and an "exception" in a deed is that the subject of the former is something which did not exist before but is created by and grows out of the transaction, while an "exception" is of something or some right previously existing.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. § 456; Dec. Dig. § 138.*

For other definitions, see Words and Phrases, vol. 3, pp. 2538–2544; vol. 8, p. 7656; vol. 7, pp. 6140–6144; vol. 8, p. 7787.]

**5. EQUITY (§ 71*)—LACHES—DELAY AND ACQUIESCENCE.**

In a suit by a grantor against a grantee more than 10 years after the conveyance, where no fraud is shown, the defendant is debarred by laches from setting up as a defense that the transaction was unconscionable.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 204–211; Dec. Dig. § 71.*]

**6. ESTOPPEL (§ 93*)—EQUITABLE ESTOPPEL—SILENCE.**

Where defendant was under covenant to furnish to complainant a permanent flow of water of a stated quantity for power purposes from its dam, complainant was not estopped to enforce such covenant by the fact that it made no objection, when defendant so constructed its dam and head gates, that at certain stages of water it could not operate its own works if it complied with its contract.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec Dig. § 93.*]

In Equity. Suit by the York Haven Paper Company, to the Use of Henry W. Stokes, receiver, against the York Haven Water & Power Company. On final hearing. Decree for complainant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

R. Stuart Smith, John P. Kelly, W. U. Hensel, and Charles E. Morgan, for complainant.

V. K. Keesey, C. L. Bailey, Jr., J. S. Black, and Le Roy J. Wolfe, for defendant.

WITMER, District Judge. On December 4, 1909, Henry W. Stokes was appointed receiver of the property of the York Haven Paper Company by the Circuit Court of the United States for the Middle District of Pennsylvania, upon a bill filed by Hunter & Dickson Company, a New Jersey corporation, and creditor of the York Haven Paper Company, alleging, inter alia, that by reason of the interruption of the operation of its plant, resulting from failure of water power from the Susquehanna river, the York Haven Paper Company was unable to derive its usual revenue from the manufacture and sale of paper and was without cash and quick assets sufficient to pay its current liabilities. The receiver was authorized to operate the plant and to manage and conduct the business of the company until the further order of the court.

January 10, 1910, on petition of Henry W. Stokes, receiver, the court ordered that said receiver be authorized and directed to file a bill in equity against the York Haven Water & Power Company, ancillary to the receivership proceedings, in the name of the York Haven Paper Company, but for the use and benefit of Henry W. Stokes, receiver of said company. The petition on which this order was entered alleged that, for a long time prior to the appointment of the receiver, the York Haven Water & Power Company had been diverting water from the head gates of the York Haven Paper Company and depriving the latter company of the flow of water to which it was entitled; and since the appointment of the receiver, the York Haven Water & Power Company had continued to divert the supply of water from the receiver who was operating the paper mill under the decree of the court.

Thereupon the receiver filed this bill of complaint against the York Haven Water & Power Company, by which it appears: That both the York Haven Paper Company and York Haven Water & Power Company are owners of land in York county, Pa., on the west bank of the Susquehanna river. The original tract of land, comprising the two tracts now owned by these two companies, was, from 1885 until 1901, owned entirely by the Paper Company. In 1901 the Paper Company conveyed a portion of the entire tract with a frontage on the river of about 6,825 feet through an intermediate owner to the Power Company, with the exception set forth in paragraph 3 of the bill. The remainder of the tract, having a frontage of about 208 feet, and being situated downstream from the tract conveyed to the Power Company, is still owned by the Paper Company in fee. That both before and since the conveyance to the Power Company, the Paper Company has maintained and operated upon the land which it now owns a large plant for the manufacture of paper by means of water power from the Susquehanna river. That by the deeds of conveyance under which the Power Company obtained title to its tract of land,

there was excepted and reserved to the Paper Company a sufficient flow of water from the river to enable the Paper Company to develop 3,000 horse power for the operation of its plant.

The bill further alleges that the Power Company for a long space of time, in violation of the reservation contained in the conveyance aforesaid, has so operated its water power plant as to deprive the Paper Company of a supply of water from the river sufficient to develop 3,000 horse power, and that such deprivation has been continuous, and has resulted and will further result in irreparable injury to the Paper Company.

The bill prays for an injunction restraining the Power Company from appropriating or using any water from the forebay supplying both companies, which is required in order to furnish the Paper Company with sufficient flow of water to develop 3,000 horse power; and for a decree fixing the amount of damages sustained by the Paper Company and its receiver, by reason of the defendant's wrongful use of the water, and directing the defendant to pay over such amount to the receiver; and for general relief.

The defendant demurred to the bill on the grounds that the plaintiff had an adequate remedy at law, and that the defendant, being a public service corporation, the effect of an injunction would be to put the plaintiff in the position of a favored customer entitled to water power under all circumstances.

The demurrer was argued before Judge Archbald, on July 28, 1910, and on August 3, 1910, the demurrer was overruled with leave to answer.

The defendant's answer was thereafter filed, and, upon the filing of a replication, testimony was taken, and the case is now before the court on final hearing.

## Findings of Fact.

First. The York Haven Paper Company was incorporated under the laws of Pennsylvania on January 7, 1885, for the purpose of the sale and manufacture of paper and of the materials from which paper is made.

York Haven Water & Power Company was incorporated under the laws of Pennsylvania on January 16, 1895, for the purpose of supplying water and power to the public and to firms, individuals, and corporations in the borough of York Haven, York county, Pa., and the territory adjacent thereto.

Second. On February 23, 1885, B. Gilpin Smith et al. conveyed to the York Haven Paper Company in fee, for a consideration of $100,-000, a tract of land situate in Newberry township, York county, Pa., abutting on the Susquehanna river, and containing 314 acres and 33 perches, with the hereditaments and appurtenances thereunto appertaining; the said consideration having been paid with 1,000 shares of the capital stock of that company of the par value of $100 each.

Third. On May 30, 1901, the York Haven Paper Company conveyed to the Security Title & Trust Company of York, in fee, for a nominal consideration, a tract of land situate in Newberry township,

York county, and containing 374 acres and 17 perches. This conveyance, inter alia, included that portion of the original tract conveyed by B. Gilpin Smith et al. to the York Haven Paper Company which abutted on the Susquehanna river and extended "by the various courses of the said Susquehanna river easterly and southeasterly sixty-eight hundred and twenty-five feet more or less," and, furthermore, "all and singular the water rights and privileges of said grantor in the said Susquehanna river, except as hereinbefore reserved." The exception contained in the conveyance is as follows:

"Reserving also to the said York Haven Paper Company, its successors and assigns, a sufficient flow of water to enable the said York Haven Paper Company to develop three thousand horse power for all time after the construction of the contemplated power plant by said York Haven Water & Power Company, said supply of water to be furnished said York Haven Paper Company without cost or charge to it, and delivered at head gates to be constructed at the expense of the said Power Company, in accordance with plans to be approved by the York Haven Paper Company, at such point on the lands belonging to the said Paper Company as it may designate; and the said York Haven Paper Company shall be first entitled to receive from the said York Haven Water & Power Company the said supply of water to enable it to develop the said three thousand horse power before any power which may be developed by the said York Haven Water & Power Company be used by it or furnished by it to any person or corporation; and no power shall be used or furnished at any time by said Power Company, unless said Paper Company shall be so supplied with the water necessary to develop said three thousand horse power so reserved to it. And in the event of the said Power Company refusing or failing to supply the said water necessary to create said three thousand horse power, the York Haven Water & Power Company shall pay to the said York Haven Paper Company at the rate of forty dollars per horse power per annum, for as many horse power as are represented by the difference between the amount actually furnished and the said three thousand horse power agreed to be supplied, and this payment shall be considered as liquidated damages between the said York Haven Paper Company and the said York Haven Water & Power Company. In the event of the deficiency of supply being caused by destruction of or injury to the dam race or waterworks in consequence of floods or ice, such liquidated damages shall not be enforced."

Fourth. On May 31, 1901, the Security Title & Trust Company of York conveyed to York Haven Water & Power Company in fee, for a nominal consideration, the same tract of land which was conveyed to the grantor by the York Haven Paper Company by deed of May 30, 1901, with the same exception of water power as set forth in third finding.

Fifth. Immediately after the incorporation of the Paper Company in 1885, the company commenced the erection of a paper mill on the tract of land above described and at the same time developed the water power of the river at that location to furnish power for the mill. The mill was located at the lower end of Conewago Falls, where there was a natural fall of about 19 feet. At the head of the falls was a reef of rocks from which an old canal had extended downstream along the Paper Company's property. In this canal some distance below the reef of rocks, head gates were constructed, and below the head gates the old canal was widened and deepened and used as a head race leading the water to the mill. Above the head gates, a crib dam was built extending upstream to the reef of rocks which was partially

blasted out so as to permit the flow of water into the basin formed between the crib dam and the shore. Between 1885 and 1901 this crib dam was twice rebuilt, each time with a greater width of basin between the shore and the head of the crib dam. All this work was done under the direction of Henry L. Carter, president of the Paper Company.

Sixth. Immediately after the incorporation of the Power Company in 1901, a power house equipped with turbine wheels and electrical machinery was erected by the Power Company alongside the paper mill but farther out from the shore. From the power house a stone retaining wall was built upstream for a distance of 3,300 feet, and farther out from the shore than the old crib dam of the Paper Company. Then from the upper end of the wall there was built a crib dam for a further distance of 1,500 feet past the middle of the river and in the direction of an island (known as Duffy's Island) lying near the Lancaster county shore. The old crib dam was entirely destroyed. The retaining wall and new crib dam formed a large basin or forebay, at the lower end of which, along the side of the power house, were the pen stocks or openings leading to the turbines, which were protected from ice and débris by iron racks. At the same time, the old head gates of the Paper Company were removed and the old race bank partly destroyed, and new head gates were constructed at the upper end of the paper mill, about opposite the turbines of the Power Company. Thereafter the turbines of the Power Company and the head gates of the Paper Company both received their supply of water from the same basin or forebay. The new head gates of the Paper Company consisted of a cement wall in which there were six openings, each nine feet in diameter and each provided with a "butterfly" gate, pivoting on a vertical shaft in the center. Below these head gates, the head race of the Paper Company lay between the paper mill and the shore, with inlet pipes leading to the wheels installed in the several buildings of the paper mill plant. Henry L. Carter supervised the erection of the Power Company's plant and water power works and at that time was president of both the Power Company and the Paper Company.

Seventh. The Paper Company manufactures principally wrapping paper from hemlock or spruce wood, by the sulphite process and ground wood process. The plant of the Paper Company includes a group of buildings located between the head race and the river, on land still owned by the Paper Company. These buildings are the sulphite mill, containing the digesters which prepare the sulphite pulp; the ground wood mill, where the wood is prepared for the sulphite mill and is also ground to make mechanical pulp; the wet machine room, containing the wet machines; the beater room, where the raw material is finished up and prepared for the paper machines; and the machine room, containing the paper machines.

The plant has an average capacity of 57 tons of paper every 24 hours. There are four water wheels (turbines) in the ground wood mill. One operates the "chipper" for chipping wood for the sulphite mill, two operate the grinders, and one operates the machinery in the

wet room and a generator for electric lighting. There is one turbine in the beater room, which operates the "beaters" and all the machinery for conveying the sulphite and ground wood to the paper machines. The four turbines in the ground wood mill have a capacity of 350 horse power each. The beater wheel has a capacity of 700 horse power. Making a total water power capacity for the whole plant of 2,100 horse power. There is a steam plant of small capacity which furnished power for the machine room and steam for cooking the sulphite, but is insufficient to operate the other departments of the plant.

The manufacture of the raw material (wood) into pulp and preparing it for the paper machines is entirely dependent on water power. If water power fails for any reason, the plant is obliged to shut down. The water flows from the forebay formed by the Power Company's works, through the head gates built by the Power Company, into the Paper Company's head race, which is 75 feet wide, 300 feet long, and 18 feet deep. From the head race the water passes through flumes to the five turbines and discharges into the tail race located below the Power Company's plant. The maximum head— i. e., the difference between the level of the water in the head race, and its level in the tail race—is 22 feet.

To operate all five wheels at the proper speed and without interruption, the water in the Paper Company's head race must be maintained at a depth of 12 feet, measured from the bottom of the head gates. When the water gets below that level, the power gradually decreases and the wheels lose their normal speed. It is possible to operate some but not all of the wheels with the water at less than 12 feet in depth, and under those conditions part of the plant must be shut down. In order to run the mill to its full capacity and prepare the raw materials for the paper machines, it is necessary to operate all of the five turbines. When the speed of the wheels is reduced by the water falling below 12 feet in the head race, it also interferes with the finishing processes and the operation of the paper machines.

Eighth. The Power Company has an installation of 20 pair of 78½-inch turbines and one pair of 62-inch turbines. The turbines of the Power Company are at such a level below the turbines of the Paper Company that the Power Company can run when the Paper Company cannot, and the Power Company's turbines have about 11 times greater capacity for drawing water from the river than those of the Paper Company. When the paper mill race is dry, there are still about nine feet of water in the forebay, and the Power Company can operate, though not at full load.

Ninth. The Paper Company kept a record known as a "log book," in the regular course of its business, showing the total quantity of paper produced, the height of water in its head race, and data relating to the operation of the turbines. Measurements of the height of water and observations of the operation of the turbines were recorded daily in this book by the men that made them. This record shows that during the latter part of the year 1909, and the year 1910, the

plant of the Paper Company was often either partially or wholly shut down by reason of low water.

The daily station records of the York Haven Water & Power Company which are in evidence (pages 328–329) show that during the same periods, and at the same time, the turbines of the Power Company were in operation drawing water from the forebay from which the Paper Company gets its supply of water, and thereby furnishing power to generate electric current at the plant of the Power Company. It happened frequently that while the Paper Company's turbines were in operation, the water in their head race was drawn down by the Power Company so that the paper mill was obliged to stop running.

Tenth. When all the turbines of the Paper Company are running to their full capacity, they are capable of using only 2,100 horse power; so that any operation of the Power Company's turbines at a time when there is not sufficient water in the Paper Company's head race to fully operate the Paper Company's turbines necessarily results to some extent in depriving the Paper Company of the 3,000 horse power reserved in the conveyances.

Since 1905 the plant of the Power Company has been operated under the management of Edwin F. Baker, who, until February 24, 1910, was general manager, and after that date the receiver of the York Haven Water & Power Company.

On various occasions Mr. Baker operated the Power Company's turbines with the expressed purpose of depriving the Paper Company of water, and frequently he compelled the paper mill to shut down by starting more wheels of the Power Company when there was no necessity or demand for the additional current thereby produced. He admitted, on cross-examination, that his practice when the water got below a normal level was to continue operating the Power Company's turbines, regardless of the needs of the Paper Company.

Eleventh. The water supply in the Susquehanna river is variable. At certain times of the year the volume of water in the river is very much reduced. It is a rule recognized among all millowners that at times when the stream is at its low-water stage, it is important that the head should be kept to the highest mark; that the wheels should be operated under as high a head and fall as possible, the head being the water above the wheel, and the fall being the water passing out from the wheel to the tail race through the draft tube, and the two together making the head and fall, operating upon the turbine wheel. At seasons of low water it is important, and it is the general rule among millowners, to keep the head as high as possible, because that permits operating the turbine wheel at a less opening of gate to obtain the same power, and therefore there is no unnecessary waste of water.

Twelfth. The only recognized and scientific method of operating such a plant as that of the Power Company, when the volume of the water in the river is reduced, is to maintain as high an effective working head as possible and to so regulate the load on the turbines that the water passing through the turbines will never exceed the normal flow of water in the river. By the term "load" is meant the demand

made on the turbine by the generator to which the turbine is connected. If the turbines draw from the forebay or reservoir more water than is naturally flowing into the forebay, the level of the water of course falls.

A given quantity of water operating under a certain head will produce a certain output on the electrical generators. If for any reason the head is reduced, it requires a correspondingly greater volume of water through the same turbines to produce the same output on the generators.

It is necessary, in order to deliver the power to their customers under the best efficiency, that the speed and voltage be kept at a predetermined value and be kept constant. If, for any reason, the working head of water is reduced, it then becomes necessary, in order to maintain these conditions, to increase the volume of water passing through the turbine; and, if there is not a sufficient volume of water to do this, then the plant is operating at a very low efficiency.

The method adopted by Edwin F. Baker in his management of the power plant of the Power Company during 1909 and 1910 was such that the Power Company did not obtain the full efficiency of the water passing through the turbines during the periods when there was a limited volume of water in the river. His method of operating the plant during the periods of reduced volume of water in the river was frequently such as to pass through the turbines a larger volume of water than the natural flow of the river, and, by so doing, to draw upon his storage capacity, thereby reducing his working head until eventually it became necessary to demand that his customers take off their load to enable him to accumulate water in his storage basin and thereby obtain a suitable working head.

Thirteenth. These methods were employed by Mr. Baker in 1909 and 1910, when the volume of water in the river was reduced. These methods not only operated to the disadvantage of the Power Company, but also took the water supply away from the Paper Company, and owing to the fact that the Power Company was able to draw a larger volume of water from the storage basin than the Paper Company, the water supply was often completely taken away from the Paper Company, thereby making it impossible for the Paper Company to operate its plant, which threatens to continue if not otherwise prevented.

Fourteenth. The effect of this interference with the supply of water of the Paper Company has been injurious to the company's business. The fixed charges and overhead charges continued while the mill was idle. Paper that had been sold could not be promptly manufactured and delivered, and a great many orders were canceled. The company was obliged to lay off men, and in many instances experienced men would get employment elsewhere.

Fifteenth. The property of the Paper Company does not abut on the Susquehanna river at any point, and the head gates of the Paper Company are now the property of the defendant, built there by mutual agreement.

Sixteenth. In 1906 and 1907 the defendant raised the level of the water in the river at York Haven 30 inches by extending the dam from a point known as Anchor Rock over to Duffy's Island, a distance of about 3,875 feet. The result of the extension of the dam was to provide greater reservoir capacity in the forebay, and consequently more available head for both companies.

Seventeenth. The principal customers of the defendant are the Harrisburg Light, Heat & Power Company, Valley Traction Company, Pennsylvania Steel Company, Steelton Light, Heat & Power Company, Middletown borough, Edison Electric Light Company of York, which supplies current to the York Railways Company, and a number of manufacturing establishments in York and Middletown.

Eighteenth. The defendant is not engaged in supplying electrical current directly to the public. It does not operate any electric lighting plants or street railways of its own. Excepting Middletown borough, all of the current produced by the defendant is sold to other corporations which are themselves in some instances public service corporations. The Harrisburg, Light, Heat & Power Company, the Valley Traction Company, the Pennsylvania Steel Company, and many of the manufacturing establishments have auxiliary steam plants of their own, and are consequently not dependent on the defendant company for current. The Steelton Light, Heat & Power Company had an arangement to get current from the Pennsylvania Steel Company when the power from the defendant company failed. The Edison Electric Light Company of York had a steam plant, but not of sufficient capacity to supply its own needs and that of the York Railways Company, its customer; so that if the power derived from the defendant failed, either the electric lighting system or the street railway system of York would be crippled. Of all the defendant's patrons, Middletown borough was the only consumer of electrical current with no other source of supply than the defendant.

Nineteenth. For the reason that the defendant company was unable to control the river conditions, all its contracts, except that with the Pennsylvania Steel Company, expressly stipulate:

"That the company (defendant) agrees to use reasonable diligence in providing a regular and uninterrupted supply of electricity, but does not guarantee the constant supply of electricity and will not be liable in damages to the consumer for failure to supply electricity when prevented by causes beyond its control."

Twentieth. The attempt by the defendant to put the Paper Company in the position of interfering with public necessities fails for want of sufficient evidence. It is clear that the only result of enforcing the paramount license of the plaintiff to sufficient flow at its head gates to develop 3,000 horse power during low stages of the river is to injure the private business of the York Haven Water & Power Company.

Twenty-First. There is no evidence of fraud or deception practiced by the plaintiff upon the defendant or the Security Title & Trust Company at the time of the sale. Neither does the evidence show an unconscionable bargain.

## Conclusions of Law.

First. The right of both plaintiff and defendant to develop any water power on the Susquehanna at the locus in quo is merely a revocable license under the milldam act of 1803.

Second. The license of the plaintiff to develop 3,000 horse power is paramount to the right of the defendant.

Third. Any interference by the defendant with this paramount license of the plaintiff is an invasion of the latter's right of property.

Fourth. The case is one of continuing trespass upon a right of property and is cognizable in equity (a) because the injury threatens to become permanent, (b) because equitable intervention is necessary to prevent a multiplicity of suits, and (c) because the remedy at law is inadequate to meet the exigencies of the case.

Fifth. The clause in the deed from the plaintiff to the Security Title & Trust Company of York, dated the 30th day of May, 1901, providing for a sufficient flow of water at and into the head gates of the plaintiff to develop 3,000 horse power, is an exception.

Sixth. The stipulation as to liquidated damages in the conveyance of the 30th of May, 1901, by the plaintiff to the Security Title & Trust Company, covers only a refusal or failure to deliver the water belonging to the plaintiff at its head gates, and is not a provision for a wrongful appropriation and use thereof by the defendant, constituting a trespass upon plaintiff's right of property.

Seventh. The plaintiff's rights are clear and undoubted, and a prior adjudication thereof in a court of law is not necessary to entitle the plaintiff to injunctive relief.

Eighth. The defendant is not a quasi public corporation, nor is it engaged in business as a public service company.

Ninth. The transaction between the plaintiff and the Security Title & Trust Company of the 30th of May, 1901, and that between the latter and the defendant corporation on the same day, was not a legal fraud.

Tenth. There is no estoppel operative against the plaintiff in this case by reason of the fact that its officers stood by and saw the defendant placing its head gates considerably lower than the head gates of the plaintiff.

## Discussion.

[1] "The common-law doctrine that fresh-water rivers, in which the tide does not ebb and flow, belong to the owners of the banks, has never been applied to the Susquehanna, and other large rivers in Pennsylvania." Carson v. Blazer, 2 Bin. (Pa.) 475, 4 Am. Dec. 463. The absolute estate of a riparian owner on the principal rivers of the commonwealth extends no further than to ordinary high-water mark, but beyond this point to ordinary low water the riparian proprietor holds a qualified estate, subject to the public rights of navigation. Beyond ordinary low-water mark the title to the bed of the stream is in the commonwealth.

[2] By the act of the 19th of February, 1801 (3 Smith's Laws, p. 462), the Susquehanna river to the Maryland line was declared to be

,a public highway. By the act of the 23d of March, 1803 (4ʼ Smith's Laws, p. 20), otherwise known as the milldam act, all riparian owners on any navigable stream of water, declared by law a public highway, excepting the rivers Delaware, Lehigh, and Schuylkill, were authorized to erect dams for mills or other waterworks upon any such stream, adjoining their own lands, and to keep the same in good order and repair, together with the right to lead off on his own land so much of the water of such stream as might be necessary for the operation of such mills or waterworks, subject to the navigation rights of the public.

However, the right of a riparian proprietor on the Susquehanna, under this act, is no more than a revocable license (Monongahela Navigation Co. v. Coons, 6 Watts & S. [Pa.] 101), and may be revoked by the state whenever the paramount interests of the public shall require it (N. Y. & N. R. R. Co. v. Young, 33 Pa. 175). Under this legislation the riparian owner acquires no title to the corpus of the water. Mayor, etc., v. Commissioners, etc., 7 Pa. 348. He has none at common law. Said Mr. Justice Williams, in Fulmer v. Williams, 122 Pa. 207, 15 Atl. 728, 1 L. R. A. 603, 9 Am. St. Rep. 88:

"In the case of all navigable rivers the bed in which they flow belong to the public. The right to the use of water follows the ownership of the bed in which it flows."

In the case just cited, being on the Lehigh river, and therefore not within the provisions of the milldam act, it was held that the riparian owner had no interest in the waters of the river for the purpose of water power, and this principle was applied to the waters thereof flowing over the qualified estate between high and low water marks.

While the right of the riparian proprietor on the Susquehanna under the milldam act is a revocable license, it is nevertheless a license coupled with a riparian interest; it follows the interest and passes to the alience thereof, unless excepted or reserved.

Said Mr. Chief Justice Gibson in McCalmont v. Whitaker, 3 Rawle (Pa.) 84, 23 Am. Dec. 102:

"The water power to which a riparian owner is entitled consists of the fall of the stream when in its natural state, as it passes through his land, or along the boundary of it, or, in other words, it consists of the difference of level between the surface where the stream first touches his land, and the surface where it leaves it. This natural power is as much the subject of property as is the land itself, of which it is an incident, as it may be occupied in whole, or in part, or not at all, without endangering the right or restricting the mode of its enjoyment, unless where there has been an actual adverse occupancy or enjoyment for a period commensurate with that required by the statute of limitations."

Any sensible interference with the natural flow of the stream, if wrongful, whether attended with actual damage or not, is actionable. Clark v. Railroad Co., 145 Pa. 449, 22 Atl. 989, 27 Am. St. Rep. 710.

[3] The bill of complaint in this case proceeds upon the theory of the right of property of the Paper Company in the, water power appurtenant to the land conveyed to the Power Company. The deed from the Paper Company to the Power Company contains a specific reservation to the grantor of the right to use sufficient water of the

river to develop 3,000 horse power, and 3,000 horse power was excepted from the grant. The bill is to restrain a continuing trespass by the Power Company upon the right of property of the Paper Company to the 3,000 horse power excepted out of the grant and reserved by the deed. The thing complained of is a tort. The bill alleges an unlawful interference with the complainant in the use of the water and the threatened continuance thereof by the Power Company, to the irreparable injury of the Paper Company.

One of the defenses set up by the Power Company was that by its deed it acquired all the water power rights incident to the land conveyed, and that by the conveyance it became bound by a covenant to furnish and supply sufficient water to the Paper Company to develop 3,000 horse power, whereby the Paper Company became one of the power customers of the Power Company; that, if the water was not furnished, the remedy of the Paper Company was an action at law to recover the liquidated damages provided for in the deed.

We think this defense not well taken. When the Paper Company sold the tract to the Security Title & Trust Company of York, the conveyance carried with it the revocable license under the milldam act, as an incident to the land conveyed, subject to the exception therein contained, which reserved to the Paper Company, for the benefit of the land remaining to it, the right to exercise the revocable license to the extent of the development of 3,000 horse power. In other words, the license of the Paper Company to develop 3,000 horse power was paramount to the license of its grantee. Originally the Paper Company was vested with the whole license appurtenant to the whole tract. It parted with part of the tract, excepting and reserving a certain tract, and further excepting to itself, as the owner of the excepted tract, the paramount right to develop 3,000 horse power. The license of the Power Company to develop any water power by reason of its riparian ownership under its conveyance from the Security Title & Trust Company was made subservient to the paramount license of the Paper Company.

[4] While the clause relating to the water power uses the words "reserving" and "reserved," yet nevertheless we think this clause an exception.

"The essential characteristics of a 'reservation' in a deed, as distinguished from an 'exception,' is that its subject is something that did not exist before, but is created by and grows out of the transaction. An 'exception' applies only where the subject already exists." Sheffield Water Co. v. Elk Tanning Co., 225 Pa. 614, 74 Atl. 742.

Here the thing already existed, i. e., the revocable license appurtenant to riparian ownership, under the milldam act. A portion of this license was excepted from the grant, and, although the words used in this connection may not be the apt words of an exception, it is nevertheless an exception. A paramount license to 3,000 horse power was carved out of the whole license and retained by the grantor for the benefit of the lands excepted, while the residue of the license, whatever it was, passed to the grantee.

The new water power works, by agreement between the parties

litigant, were constructed by the Power Company, and the works were so located with relation to the two plants that it became absolutely necessary that the supply of water deliverable to the Paper Company at its head gates should flow through the works of the Power Company. By reason of the fact that the Power Company was in physical control of the dam, forebay, and other appliances, certain covenants were incorporated in the excepting clause. They are, in substance, as contended by plaintiff, as follows:

(a) The water not included in the grant to the Power Company is to flow from the river to the Paper Company's head gates, through the water power works and appliances constructed by the Power Company.

(b) The Paper Company is to be put to no expense in receiving the water to which it is entitled.

(c) If the Power Company prevents the Paper Company from receiving the water sufficient to develop the 3,000 horse power, the Power Company is to pay the Paper Company as liquidated damages $40 per horse power per annum for the deficiency.

The use of the words "furnish," "deliver," and "supply" in the excepting clause does not import title in the Power Company to the 3,000 horse power. The Power Company became bound thereby, by a covenant running with its land, to permit the excepted of water to pass through its works into the head gates of the Paper Company.

The superior right, recognized by the deed as being in the Paper Company, was a right as a riparian owner, notwithstanding the fact set up by the defendant that the Paper Company does not now own any lands abutting the river. It was riparian at the time of the execution of the conveyance to the Security Title & Trust Company. The exception in the deed was therefore to itself as a then riparian owner. It follows, therefore, as the covenants in the deed related to the lands of the grantor and grantee and were to be performed thereon and in connection with the use and enjoyment thereof, they ran with the land and regulated the mutual rights of the parties and their successors in title. Horn v. Miller, 136 Pa. 640, 20 Atl. 706, 9 L. R. A. 810.

We adopt the plaintiff's construction of the deed of conveyance, and, in the language of its counsel, we say:

First. Plaintiff did not convey or divest itself of its riparian right to a flow of water, at its head gates, in quantity not less than sufficient to generate 3,000 horse power. That which was granted to defendant was what might well be described as a contingent remainder or residue of the flow; the quantity being dependent upon the excess over and above the quantity of which the plaintiff did not divest itself and which was expressly excepted out of the grant. It was only so much as should remain as a surplus over and above the specified quantity or portion of the flow, and therefore was uncertain and contingent upon the quantity of water in the forebay, while the plaintiff's was fixed and not subject to diminution by defendant for any cause.

Second. The clause in the deed not only preserved unimpaired the plaintiff's right of property to a flow of water sufficient to develop 3,000 horse power, but, by an express covenant running with the land, there was imposed a charge upon the title of the defendant to furnish said supply of water to plaintiff without cost or charge to it, delivered at its head gates as then and now constructed.

If in order to comply therewith, defendant finds it necessary at certain times and under certain conditions to maintain a storage basin containing more than the quantity of water which would be required if the wheels of both parties, plaintiff and defendant, were at the same level, it must do so.

Even if, at times, it should be inconvenient, or practically impossible, for the defendant to carry on its business without trespassing upon that portion of the flow which belongs to the plaintiff, such a condition would not be a justification for trespass by the defendant on plaintiff's right of property.

The Paper Company, with its business wholly dependent upon the use of water, never intended that the supply stipulated for should be uncertain or subject to be depleted or exhausted whenever the necessities of the Power Company, coupled with low water in the river, should make it convenient or desirable, or even essential, for the purpose of its business, to use that portion of the water not conveyed or belonging to it.

The stipulation as to damages covered only a refusal or failure to deliver the water belonging to the Paper Company at the Paper Company's gates and not wrongful appropriation and use by the defendant, constituting a trespass upon plaintiff's estate.

As clearly appears from the terms of the deed, the clause providing for liquidated damages was intended to secure performance by defendant of its covenant to deliver, and not as an alternative or substitute therefor, at the defendant's election.

It did not deprive the plaintiff of its right to relief in a court of equity.

In a majority of the cases where equitable relief has been granted for violation of water rights, damages have been awarded as well as injunctions granted.

This construction of the deed in suit is in consonance with the authorities in Pennsylvania. Said Mr. Justice Sharswood, delivering the opinion of the Supreme Court in Lindeman v. Lindsey, 69 Pa. 99, 8 Am. Rep. 219:

"When the proprietors of two opposite banks of a stream of water are desirous of enjoying the advantage of the water power for propelling machinery, a dam for that purpose cannot be built except by mutual consent, unless indeed it may be what is termed a 'wing dam,' confined to the soil of the person who erects it, or that half of the bed of the stream which belongs to him. If erected by either on the land of the other, it would clearly be a trespass, and could lawfully be abated by him upon whose land it was built without his consent. When, therefore, they enter into an agreement to erect such a dam, with a covenant for themselves, their heirs and assigns, to repair or rebuild it if necessary, it is not a personal covenant merely, but runs with the land of the respective proprietors, and the stipulations contained in such agreement in respect to the enjoyment of the water power created by the dam form the basis of their respective rights."

The learned justice also said when discussing the form of the action for a violation of the privilege or easement to take and use one-half of the water (page 102 of 69 Pa., 8 Am. Rep. 219):

"But in regard to the easement or privilege of Whisler, his heirs and assigns, to take and use one-half of the water, it was a direct grant, not a covenant. * * * No one has ever supposed before that upon a grant by deed of an easement or privilege upon land or upon land covered with water by one man to another, the remedy for a disturbance of such easement or privilege was an action of covenant upon the deed. Take a common case of the grant or reservation of a right of way. Surely an action on the case may be maintained by the grantor for the obstruction of it, as well against the grantee and those claiming under him as against strangers. * * * But, contends the counsel for the plaintiff in error with great ingenuity, the grant to Whisler of one half of the water is an implied covenant that the grantor will not take the other half. True it is so, in popular language, but that does not constitute a technical covenant. In the grant of a right of way or common in the grantor's land, there is the same implied covenant by the grantor that he will not disturb its enjoyment. But that, as we have seen, does not prevent the plaintiff from resorting to an action on the case to recover damages for its disturbance."

The case of Horn v. Miller, 136 Pa. 640, 656, 20 Atl. 706, 708 (9 L. R. A. 810), lays down a similar doctrine. In this case, Cade, Horn's predecessor in title, and Miller, the defendant, owned adjoining lands on a stream and made an agreement, in settlement of an action by Cade against Miller for diverting the water from one channel to the other: This agreement provided that Cade, his heirs, and assigns, should enjoy a "water right or power" for two wheels on any part of his land, and Miller, his heirs and assigns, should enjoy water for his mill only when there was a surplus. Horn brought trespass against Miller and others for an alleged wrongful diversion of the water from the plaintiff's mill. Said Mr. Justice Clark:

"This action is trespass upon the case, for diversion of the water to the prejudice of the plaintiff's rights as a riparian owner, which, in view of the alleged previous artificial diversion of the water of the stream, were fixed and determined by the agreement of 1852. Trespass was the proper remedy. The agreement of 1852 established the rights of the parties, and the covenants were to that effect merely. The agreement was equivalent to a grant. Whatever may be conveyed by grant may be secured by covenant in this form."

Equitable intervention is sought by the plaintiff as the appropriate remedy for the prevention of continued trespasses by the defendant upon the paramount water privilege or license of the plaintiff. It is alleged that, by reason of the persistency with which these trespasses are repeated, the injury to the plaintiff threatens to become permanent. Equitable relief is also sought to avoid a multiplicity of suits.

"Equity frequently entertains a proceeding when thereby a multiplicity of suits can be avoided. * * * So while ordinarily courts of equity will not interfere merely to redress a trespass, they will do so where the trespass is a continuing one, and a multiplicity of suits is involved in the legal remedy. * * * And on this ground a suit may be maintained to prevent interference with a water privilege." Beach, Eq. Jurisp. vol. 1, § 22, pp. 22, 23.

A plaintiff will not be relegated to the pursuit of several remedies at law where the interference of equity will avoid circuity of action

and a multiplicity of suits.   16 Cyc. p. 45 (11, A, 5, a).   Said Mr. Justice Thompson, in Scheetz's Appeal, 35 Pa. 95:

"In the case in hand, if the complainants had the right they claimed, namely, the right to an uninterrupted flow to their mill of the waters of Sandy Run through the premises of the respondent, and, for the enjoyment of that right, the further right to enter on his premises to remove obstructions, the interruption of that right, by a refusal to permit the removal of obstructions, or throwing them again into the stream when removed, were acts obviously injurious not only to the enjoyment of the right, but prejudicial to its existence. Damages at law would be wholly inadequate to the vindication of such a right.   Successive suits for successive interferences, instead of redressing the wrong, would in the end be worse than the wrong itself.   There are many cases in the books of restraint by injunction for such interferences.   In principle, it is the same as the one cited from 5 Casey. 382.   Courts of equity will restrain acts of trespass, or nuisance, to prevent multiplicity of suits, Brightly's Eq. § 293.   That is, where the redress could only be by and through the medium of a multiplicity of suits or actions.   So, where wrongful acts might become the foundation of an adverse right, such as the diversion of water.   Webb v. Portland Manufacturing Co., 3 Sumn. 189 [Fed. Cas. No. 17,322]; [Gardner v. Village of Newburgh] 2 Johns. Ch. [N. Y.] 164 [7 Am. Dec. 526].   It is just in cases like the present, if the right be fully established, that the power of a court of chancery is most salutary.   The right can be ascertained, and by the same proceeding petty annoyances and vexatious litigations restrained."

Said Judge Dallas in Railroad Co. v. Fiske, 123 Fed. 760, 60 C. C. A. 621:

"The proofs made it quite evident that the trespass which had been committed would, if not restrained, be repeated, and continued; and it is well settled that, under such circumstances, an injunction may and should be awarded to secure a plaintiff against probable irreparable injury and for the avoidance of a multiplicity of suits."

It sufficiently appears from the bill in this case that neither one action nor successive actions will afford the plaintiff the complete and adequate remedy to which it is entitled.   In the language of plaintiff's counsel in their argument:

"How could the York Haven Paper Company possibly continue its business, maintain its organization and working force, meet its current obligations, and satisfy its customers of its ability to manufacture and deliver at the times fixed by its contracts, if it is to be subjected to constant interruptions of power to run its plant, and compelled to look for relief to an annual suit at law against the York Haven Water & Power Company to recover $40 per annum for each unit of horse power of which it is deprived?"

Equitable relief is sought to prevent a multiplicity of suits and to stay the irreparable injury which would result to the plaintiff by the continued and repeated trespasses by the defendant upon the paramount water privilege of the plaintiff.   The fact that, in an action at law, the damages would not have to be liquidated by the jury, for the reason that they have been liquidated by the parties, can have no bearing upon the question of the right to equitable relief.   There can be no doubt about the right of the plaintiff to injunctive relief. Beaver Falls Water Power Co. v. Wilson, 83 Pa. 83; Wilkes-Barre Water Co. v. Lehigh Coal & Nav. Co., 3 Kulp (Pa.) 389; Whitney v. Fitchburg Ry. Co., 178 Mass. 559, 60 N. E. 384; Eastman v. Parker, 65 Vt. 643, 27 Atl. 611.   We are of the opinion that, in or-

der to injunctive relief, the plaintiff need not have established its right, preliminarily thereto, by an action at law. Bitting's Appeal, 105 Pa. 517; Schuler v. Schuler, 39 Pa. Super. Ct. 635; Manbeck v. Jones, 190 Pa. 171, 42 Atl. 536. Said Judge Archbald, in Ferguson's Appeal, 117 Pa. 439, 11 Atl. 885:

"Where the complainant's rights are clear and undoubted either by the admissions of the defendant or the undisputed facts in the case, equity will enjoin the infringement of them, without remitting the party to the inadequate remedies which the law may afford."

We think the pleadings and testimony in this action presents just such a case as falls within the rule laid down.

The York Water & Power Company was incorporated under the provisions of the general corporation act of the 29th of April, 1874 (P. L. 273), and its supplements, for the "purpose of supplying water and power to the public and to firms, individuals and corporations in the borough of York Haven, York county, Pennsylvania, and the territory adjacent thereto." The evidence shows conclusively that it is not now, and never has been, in the exercise of its corporate powers for the purpose of supplying "water" to the public or to firms, individuals, or corporations in the Borough of York Haven, or elsewhere. A water company is a quasi public corporation. Foster & Co. v. Fowler & Co., 60 Pa. 27; Guest v. Water Co., 142 Pa. 610, 21 Atl. 1001, 12 L. R. A. 324. It is a public service corporation. We know of no authority in Pennsylvania holding that a power company is a quasi public, or public service corporation. So far as the furnishing of power by the defendant, to the public, is concerned, it does not stand in the attitude of a public service corporation, and its defense that the injunction prayed for, if awarded, would "interfere with the performance of its duties to the public," is not supported either by the law or the evidence. Conceding, for the sake of argument, that the defendant is a public service corporation, invested with the right of eminent domain, it must nevertheless proceed in the manner directed by the Constitution (article 1, § 10) and the acts of assembly of the commonwealth, in order to the condemnation of the paramount license of the plaintiff to sufficient flow of water to develop 3,000 horse power.

The defendant set up as a defense (12 paragraph of answer) that the price of the land conveyed by the Paper Company to the Power Company through the medium of the Security Title & Trust Company of York, was unconscionable and far in excess of the real value of the land, and that the sale of the land with the exceptions contained in the deeds was in fact and in law a fraud upon the Power Company. There is absolutely no evidence of any deception practiced by the Paper Company or by any of its officers or agents in the making of this sale. At the time of the transfer practically the same persons were interested in both companies. There was nothing concealed in the transaction. The conditions were open to both parties. They had to all intents the same officers. It is an executed contract. There has never been an application to have the contract rescinded for fraud or overreaching by the Paper Company. The

Power Company has never made any offer to surrender the fruits of the bargain to the Paper Company.

[5] If there was fraud practiced by the Paper Company upon the Power Company and its intermediary the Security Title & Trust Company, the defendant has lost its day in court on this defense, by reason of its laches. Ten years have elapsed since the date of both conveyances, and it needs no citation of authority for the principle that under such circumstances equity will not interpose on behalf of the party who has slept upon its rights for that length of time. Said Mr. Justice Mestrezat, in Jackson v. Thomson, 203 Pa. 624, 53 Atl. 506:

"Equity, like the law, abhors laches, and those who sleep on their rights must awaken to the consequences that they have disappeared."

"The rule that the statute of limitations does not begin to run or that a party cannot be charged with laches until the discovery of the fraud does not mean that one can shut his eyes to obvious facts. A person who is injured by fraud must be prompt in seeking redress. Laches and neglect are always discountenanced. Nothing can call a court of chancery into activity but conscience, good faith, and reasonable diligence." Goggins v. Risley, 13 Pa. Super. Ct. 316.

However, there is another insuperable bar to the relief of the Power Company from the terms of its bargain upon its defense of fraud. If there was a fraud, the Power Company was particeps fraudis, and under such circumstances equity will leave the defendant exactly where it placed itself.

At the time of the oral argument, the defendant's counsel laid some stress upon certain alleged irregularities on the part of the Paper Company affecting its corporate existence. Suffice it to say that this is a matter about which the commonwealth alone can complain and then only in a direct suit in the name of the commonwealth against the plaintiff. And for this authorities need not be cited.

[6] Is the plaintiff estopped to assert its right to a paramount flow of the waters of the river sufficient to develop its 3,000 horse power, by reason of standing by and permitting the defendant to construct its head gates at a lower level than the plaintiff's head gates? We think not. The manner of construction of the defendant's works gave no notice to the plaintiff that the defendant intended to, or ever would, invade the paramount right excepted by the Paper Company. Neither was it notice to the plaintiff that at certain stages of the water it would be impossible to operate the defendant's works subservient to the plaintiff's paramount license. However, if it did so appear to the plaintiff, its mere silence amounts to nothing. The mere silence of the plaintiff withheld no facts, knowledge, or information of which the plaintiff was possessed, which the defendant did not know or could not have known. The rights of the parties were fixed by the deeds. The conditions prevailing along the river, its habits, etc., were as open and obvious to the defendant as they were to the plaintiff. If estoppel at all, it would be estoppel "by silence." It has been held that "estoppel by silence" arises "where a person who, by force of circumstance, is under a duty to another to speak, refrains from doing so, and thereby leads the other to be-

lieve in the existence of a state of facts in reliance upon which he acts to his prejudice." 16 Cyc. p. 681 (1, A, 10). Surely silence cannot be held to be a waiver of a right when there is nothing to suggest an infringement or an intended infringement of that right. There is absolutely nothing in this case warranting the application of the doctrine of estoppel. To constitute estoppel by silence, the silence must amount to a fraud.

The question of damages was not pressed at the argument, and we, therefore, will not give it any consideration. In our opinion there is not sufficient evidence before us upon which we could base a decree for damages.

It is therefore adjudged and decreed:

First. The defendant, its receiver, Edwin F. Baker, its servants, agents, and employés, be and they are hereby perpetually enjoined and restrained forever hereafter from depriving the plaintiff, the Paper Company, and its receiver, Henry W. Stokes, of a sufficient flow of water at the head gates of the plaintiff corporation to develop the 3,000 horse power excepted and reserved to the plaintiff, the York Haven Paper Company, under its deed to the Security Title & Trust Company, dated the 30th day of May, 1901, recorded in the office of the recorder of deeds in and for York county, Pa., in Record Book 12 M, p. 340.

Second. The defendant, its receiver, Edwin F. Baker, its servants, agents, and employés, be and they are hereby perpetually enjoined and restrained forever hereafter from appropriating or using at any time, for any purpose whatsoever, any water in the dam or forebay of the defendant, the York Haven Water & Power Company, necessary to allow a sufficient flow of water at the head gates of the plaintiff the York Haven Paper Company to develop the 3,000 horse power excepted and reserved to the plaintiff, as aforesaid.

Third. The defendant, the York Haven Water & Power Company, its receiver, Edwin F. Baker, its servants, agents, and employés, be and they are hereby perpetually enjoined, and restrained forever hereafter, from appropriating. or using at any time, for any purpose whatsoever, any water in the dam or forebay of the defendant, the York Haven Water & Power Company, to any extent which will not leave unappropriated and unused by the said defendant a sufficient flow of water at the head gates of the York Haven Paper Company, the plaintiff, to develop the 3,000 horse power excepted and reserved, as aforesaid.

Fourth. That on plaintiff's motion a special master be appointed to ascertain, and report to the court, the amount of damages suffered by the York Haven Paper Company, and its receiver, by reason of said wrongful use and appropriation, by the defendant, of the said supply of water reserved to the said plaintiff, and for defendant's failure to supply and deliver, at the plaintiff's head gates, the water as aforesaid, to the end that a proper order may be made requiring and directing the said defendant, the York Haven Water & Power Company, to pay over to the plaintiff the receiver of the York Haven Paper Company the amount of damages sustained in manner, as aforesaid.